ARMSTRONG *v.* STATE.

Opinion delivered November 1, 1926.

1.  CRIMINAL LAW—MOTION FOR NEW TRIAL—ASSIGNMENTS OF ERROR. —Assignments of error in a motion for new trial that the court erred in excluding the testimony of various witnesses and in admitting testimony objected to, without pointing out what testimony was excluded or improperly admitted, are too general to raise any questions for review.

2.  CRIMINAL LAW—SUFFICIENCY OF ASSIGNMENTS OF ERROR.—Assignments of error in a motion for new trial need not be specific as to the grounds on which the exception is based, but must be sufficient to identify the particular witness and the testimony to which the assignment is directed.

3.  CRIMINAL LAW—SUFFICIENCY OF ASSIGNMENTS OF ERROR.—An assignment of error in a motion for new trial that the court erred in giving each and every instruction, without mentioning them by number or substance, is an exception in gross, which is not permissible.

4.  HOMICIDE—SUFFICIENCY OF EVIDENCE.—Evidence *held* to sustain a conviction of murder in the second degree.

5.  HOMICIDE—HARMLESS ERROR.—Appellant cannot complain because the jury found him guilty of murder in the second degree when the evidence established his guilt of the higher degree.

Appeal from Logan Circuit Court, Northern District; *James Cochran,* Judge; affirmed.

*White & White,* for appellant.

*H. W. Applegate,* Attorney General, and *John L. Carter,* Assistant, for appellee.

McCULLOCH, C. J.   Appellant was indicted for the crime of murder in the first degree, committed by killing his wife, Marie Armstrong, and on the trial of the case he was convicted of murder in the second degree, and his punishment fixed at six years in the penitentiary.

There were several exceptions saved to the rulings of the court in the introduction of testimony, and those rulings are assigned here as grounds for reversal of the judgment, but the exceptions were not sufficiently raised in the motion for a new trial in order to preserve them for review by this court.   The only assignments in the motion for a new trial relating to those rulings are as follows:

"1.   The court erred in excluding the testimony offered by the defendant, and committed several errors in excluding the testimony of the various witnesses offered by the defendant and excluded by the court.

"2.   The court erred and committed several errors in admitting the testimony admitted over the objection and exception of the defendant."

These assignments are too general to properly raise the question as to the admissibility of the testimony pointed out in the exceptions made during the progress of the trial.   *Lomax* v. *State,* 165 Ark. 386.   It is not essential that the assignments in a motion for a new trial be specific as to the grounds upon which the exceptions were based, but they must be sufficient to identify the particular witness and the testimony to which the assignment is directed.   An assignment as general in its nature as those set forth in the motion for a new trial now before us does not apprise the trial court of the errors sought to be reviewed, and gives the court no opportunity to correct its errors, hence there can be no review here.

The same may be said about the assignments of error relating to the court's charge to the jury. The instructions to which the exceptions related were not mentioned in the motion for a new trial, either by number or by substance. It is merely alleged in the motion that the court "committed separate and several errors in the giving of each and every instruction given by the court." This is an objection in gross, which is not permissible.

The only other assignment of error relates to the legal sufficiency of the evidence.

Appellant and deceased were negroes, and lived on the farm of a Mr. Horne, about two and a-half miles distant from Paris. Appellant had a daughter by a former marriage, and also had children by decedent. The dead body of appellant's wife was found in a well about sixty yards from their dwelling-house, early in the morning of December 28, 1925. The theory of the State is that appellant killed his wife by striking her with some kind of blunt instrument or rock, and that he then threw her into the well where the body was found. Appellant's contention is that his wife accidentally fell into the well and was drowned.

In addition to appellant's wife and family, he had living with him a hired colored boy named Ernest.

Mrs. Nora Horne, who lived about two hundred yards distant from appellant's home, testified that, on the morning in question, before daylight, she heard voices over at appellant's home, which she recognized as those of appellant and his wife. She testified that she heard appellant's voice, but could not distinguish what he said, and that she heard appellant's wife say, "Oh, Mr. Boss, Mr. Boss, Mr. Boss," and also heard her say, "Oh, Ernest, help me!" The witness testified that she hollered to the boy Ernest, and that, when he answered to the call, she called back to him, saying, "If Boss don't quit, we are going to have him arrested." The witness testified that appellant made no answer. The witness further testified that she could hear appel-

lant talking to the boy, and heard the boy answer, "I'm afraid to," but she could not distinguish what it was appellant said to the boy.

Walter Horne, husband of the preceding witness, testified that, about four-thirty o'clock on the morning in question, he walked out on his porch and "heard a racket, and discovered that it was down at Boss's" (meaning appellant), "and heard deceased, Marie, holler, 'Mr. Boss, Mr. Boss, Mr. Boss,' probably half a dozen times"—that, after that, he heard appellant say, "Go on, Ernest." The witness testified that he at once started in the direction of appellant's home and met the boy, Ernest, who told him that deceased was in the well, and that he (witness) then ran back to his own house and got a butcher-knife and cut down a swing-rope hanging in the yard, and then went over to appellant's house to try to get the woman out of the well. The witness told all about the removal of the body from the well. The woman was dead at the time she was taken out, and was lifted out, after much difficulty, with grabs or hooks. According to the testimony of the witness, the well was about sixty yards from the house, and it was walled up with rock to the surface of the ground and also to a distance of about a foot or a foot and a-half above the ground. The well was about four and a-half feet square, but the covering lapped over so that there was a space of about two feet wide, and there was an ordinary bucket attached to the rope, which was used in drawing up water. There was no windlass or other appliance, and the custom was to drop the bucket down into the water and draw it up by hand. The water was within four or five feet of the top of well.

Witnesses who testified concerning the removal of the body from the well stated that there were wounds made on the head and face of the body where the hooks came in contact with them. One of the witnesses testified that the body was upright in the water, "just like she was standing in a well." A physician, who assisted in the examination of the body after it was removed

from the well, testified that there was a fracture of the skull in the median line, extending up and back to the right about three-fourths of an inch; that there was a lineal fracture extending parallel to the longitudinal suture about two and a-half inches in length, that appeared to have been caused by a crushing blow, and that blood was continually oozing from it. That on the left side of the head, extending down into the left orbit, was another fracture; that three inches to the left of that was a fracture extending from the outer angle of the left orbit up and back about three inches; that there was a gash to the right of this, extending in the direction indicated by the witness, from which blood was oozing. The witness also testified that he discovered flesh wounds which were made by the grabs, or hooks, being buried in the flesh, and that the fractures spoken of were sufficient to produce death. The witness testified that he and his father, another physician, had held a *post mortem* and removed the lungs, but that they could not find any evidence of water being in the lungs or any other evidence of drowning. Another physician testified to the same effect, describing the wounds, and giving his opinion as to the cause of death and what time death occurred with respect to the body going into the well. The last physician testified that he did not find any water in the lungs, and that "a part of the lungs showed that she was in the well before she quit breathing entirely."

Appellant testified as a witness in his own behalf, and stated, in substance, that, when he and his wife arose early in the morning, he was making preparations to assist in killing hogs for his landlord, and that his wife was making preparations to cook breakfast; that, when he told her to get a water-bucket and wash it for him to get milk in, he put on his shoes, and, after leaving the house, crossed a branch about sixty-five yards from the house, and heard his wife calling, "Mr. Boss, Mr. Boss." He stated that he thought she was trying to scare him, and did not give the matter much consideration, but walked back to the house and into the front room, and

asked the boy where his wife was; that he then got some matches and went back out of the house with the milk bucket still in his hand; that when he reached the well he failed to find the bucket, and concluded that his wife, while drawing the water, had stepped back into the bushes somewhere. He testified that he then went back to the well, and struck a match and looked down into the well, and saw something white in the water, which he found to be clothing on the body of his wife. He testified that he then began to holler, and told the boy to go and get some help, but the boy replied that he was afraid. The witness denied that he struck his wife or had any trouble with her, and that he knew nothing about the accident until he found the body in the well. Other witnesses who came on the scene testified that they examined the surroundings, and found no evidence of a struggle.

We think the evidence was sufficient to warrant the inference that the woman did not accidentally fall into the well, but that she was either slain by blows on the head and thrown into the well, or that she was thrown into the well and drowned. In the first place, the testimony of the physicians tends to show that several serious fractures of the woman's skull, caused by blows on the head, were sufficient to produce death, and that she was entirely dead, or was in the last throes of death, when she was thrown into the well. In the next place, the testimony of Mrs. Horne and her husband was sufficient to warrant the inference that appellant and his wife were engaged in some sort of hostile encounter, at least hostile on his part, a few moments before she got into the well. The account given by appellant is quite unreasonable, and it is also improbable that the woman could have gotten into the well by accident. According to the testimony, there was a narrow opening about two feet wide, and, though it was dark at the time, the woman was familiar with the well, and had been accustomed to drawing water there. The jury had a right, in considering all of this testimony, to determine that appellant had killed his wife and thrown her into

the well. The verdict of the jury can scarcely be said to be a consistent one, for if, as the testimony tended to show, appellant killed his wife and threw her into the well, he was guilty of murder in the first degree, and should have been punished accordingly. The fact, however, that the jury has mitigated the punishment affords no reason for setting aside the verdict.

Judgment affirmed.